**Francis Murphy HEAD**

v.

**WACHOVIA BANK OF GEORGIA, N.A., et al.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

March 14, 2002.

Permission to Appeal Denied by Supreme Court Oct. 21, 2002.

Andree Sophia Blumstein and William L. Harbison, Nashville, Tennessee, for the appellant, Francis Murphy Head.

Michael L. Dagley and Andrea Taylor McKellar, Nashville, Tennessee, for the appellees, Wachovia Bank of Georgia, N.A. and A. Gilmore Crumpler, Jr.

C. Dewey Branstetter, Jr., Nashville, Tennessee, for the appellee, David D. Addison.

## OPINION

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., and JOHN J. MADDUX, JR., Sp. J. joined.

Petitioner filed a petition for judgment against the bank that served as trustee of Emily Robinson Frazer's revocable trust and executor of her estate, as well as several of its employees, for breach of fiduciary duty during the management of her trust and administration of her estate. Petitioner also requested that the estate be re-opened, that a new administrator be appointed, and that the bank be removed as trustee from all trusts in which Petitioner is a beneficiary or has an interest. These requests were motivated by claims of breach of fiduciary duty by the bank and a resulting conflict of interest between Ms. Frazer's estate and the bank in all subsequent services performed by the bank. The breach of fiduciary duty was based on allegations by Petitioner that the bank should have closely monitored Ms. Frazer's personal spending habits, that they should have prevented Ms. Frazer from withdrawing money from her revocable trust, that her trust officer should have known that this money was ultimately being embezzled from an account in another bank, and that the bank should have then taken steps to end this embezzlement and recover stolen money beyond the amount of recovery requested and agreed to by Ms. Frazer. Respondents moved for summary judgment, which motion was granted by the Probate Court of Davidson County. We affirm the order of the probate court and find that there was no breach of fiduciary duty by the bank, or any of its employees, as Ms. Frazer was fully aware of all circumstances of which Petitioner complains and determined how she wished the situation to be handled. She was competent and in complete charge of her revocable trust, the money requested from the trust, the money spent outside the trust, and decisions made regarding recovery of stolen funds. The probate court's dismissal of the entire matter is affirmed.

## I. Factual History

This story centers around one woman, Emily Robinson Frazer, and the handling of her revocable trust and estate. The preliminary facts extend all the way back to around 1980 or 1981, when Ms. Frazer began some renovations of her very large Nashville home. She hired Pennington Builders, owned by Dwight Pennington, to perform the renovations. Dwight was married to Anne Pennington, the daughter of another prominent Nashville couple who were social friends of Ms. Frazer. These renovations went on for many years and cost Ms. Frazer a great deal of money. Her grandsons, and others associated with her, became suspicious that Pennington was charging for services not performed, but whenever Ms. Frazer was asked about the renovations or her finances, she let those inquirers know that she knew what she was doing, she was perfectly capable of taking care of her affairs, and she did not appreciate the intrusion into her life.

During the renovations, Anne Pennington apparently worked in some capacity for Pennington Builders, possibly as an interior decorator for Ms. Frazer's project. Over the years, Ms. Frazer developed a close personal relationship with Ms. Pennington, who began assisting Ms. Frazer, then in her late 80's, with personal errands. She eventually became a personal bookkeeper and purchaser for Ms. Frazer, spending a great deal of time with her and almost exclusively managing her check book and personal finances.

Ms. Frazer's family was intimately connected with an Atlanta bank, then known as First National Bank of Atlanta (hereinafter "FNBA"), now Wachovia Bank of Georgia (hereinafter "Wachovia"). Other family trusts were being managed at FNBA, and sometime in 1989, Ms. Frazer decided to move the bulk of her assets back to FNBA. She signed a revocable

living trust agreement naming FNBA as trustee on March 23, 1989 and placed most of her assets in this trust. Respondent, David Addison, was the trust officer at FNBA who handled her account.

Ms. Frazer continued to maintain a checking account for her regular expenses at First American National Bank in Nashville (hereinafter "First American"). All checks for payment of any personal or household expenses were written out of the First American account. When she needed additional money, she would contact Mr. Addison at FNBA, and he would have a check for the amount requested sent directly to her residence. She would then deposit these checks into her First American checking account.

On January 4, 1990, Mr. Addison began a romantic affair with Ms. Pennington. A few months later, in March of 1990, a member of Ms. Frazer's staff discovered that Ms. Pennington was embezzling money from Ms. Frazer. The thefts were accomplished by writing checks for small amounts to bogus companies and altering the amounts of the checks after they were signed by Ms. Frazer. When presented with this information, Mr. Addison resigned from his position at FNBA. No evidence was ever presented showing any involvement by Mr. Addison with the embezzlement activities of Ms. Pennington or showing that he had any knowledge thereof.

Ms. Frazer had three grandsons Dixon Head, Emerson Head, and Francis Head (Petitioner), all of whom were involved in the resolution of the embezzlement matter. Their father, Ms. Frazer's only child, was deceased.

The grandsons were first contacted by an employee of Ms. Frazer and informed of the embezzlement and affair. They immediately decided to contact the law office of Jones, Day, Reavis, & Pogue (hereinafter "Jones, Day") to obtain assistance, since attorneys' at Jones, Day had represented their family previously. FNBA was also contacted. Ms. Frazer and her grandsons chose to contact the FNBA and Jones, Day to handle the situation due to their close family ties to both organizations and their desire to prevent publicity. Representatives from both offices were sent to Nashville to meet with Ms. Frazer and her grandsons regarding the matter. The family chose not to involve law enforcement agencies in the matter, allowing FNBA to conduct an investigation. Ms. Frazer was presented with proof of both the affair and the embezzlement at a meeting in her home. Although she was already aware of the affair, she was completely shocked by Ms. Pennington's betrayal.

All parties testified that Ms. Frazer's primary concern was avoiding public scandal. She was much more upset about the betrayal and potential for embarrassment than loss of the money. Since Ms. Pennington's family was also a very prominent Nashville family and long time friends with Ms. Frazer, she initially wanted to just 'sweep the whole matter under the rug.' However, Rick Kirby, an attorney with Jones, Day, convinced her to let them try to handle things quietly. She acquiesced but insisted on no legal action and no publicity. Pursuant to Ms. Frazer's desires, the matter was settled quickly and neither she nor any family member ever made any other attempts to have Ms. Pennington, Mr. Addison, or any other person or entity prosecuted or held legally responsible for other alleged losses, until Petitioner's current action was filed almost five years later.

Following the Nashville meeting at Ms. Frazer's home, a meeting was quickly set up involving a Jones, Day attorney, representatives from Wachovia, and Ms. Pen-

nington. When confronted with the evidence, Ms. Pennington confessed to the embezzlement. The individuals at that meeting quickly negotiated a settlement without informing Ms. Pennington of Ms. Frazer's desire to not pursue legal action and before Ms. Pennington had the opportunity to consult her own legal counsel. The settlement negotiations were relayed to Ms. Frazer, her grandsons and her attorney, Mr. Kirby, at her home until all parties agreed on a settlement. Under the terms of the settlement, Ms. Pennington was to repay $525,000.00 and return several personal items in return for Ms. Frazer's agreement not to pursue legal action. (The $525,000.00 figure was arrived at based on a review of checks written as compared to the amounts entered in Ms. Frazer's check log since the time FNBA began managing her trust, plus an additional amount for attorney's fees and expenses of recovery.)

Prior to entering into the settlement agreement, Ms. Frazer was aware of Ms. Pennington's personal involvement with Mr. Addision, an employee of FNBA and her trust officer. She was also made aware that Ms. Pennington had likely been embezzling money for some time prior to the formation of her trust at FNBA; however, Ms. Frazer specifically instructed FNBA and her attorneys not to look back beyond the inception of the revocable trust at FNBA in determining the amount stolen.[1] Ms. Frazer, with the agreement of her grandsons and her attorneys, signed the Mutual Covenant Not to Sue on April 3, 1990 and received $525,000.00 from Ms. Pennington in full and final settlement of the matter. She did not request that any further action be taken by anyone and made it clear that the matter was settled to her satisfaction.

Ms. Frazer died on November 21, 1990. Pursuant to the terms of her will, executed on June 4, 1990 (two months after settlement of the embezzlement matter), FNBA was appointed executor of her will and trustee of all trusts created by her will. Her will was probated and her estate administered by FNBA, and later Wachovia, without objection from anyone. Petitioner signed a Receipt, Waiver and Release on May 6, 1991, which acknowledged receipt of personal property in satisfaction of Ms. Frazer's bequests and released the executor from any further liability in connection with the estate, with the exception of final distribution of $200,000.00 not yet received by Petitioner. On August 22, 1994, the Probate Court of Davidson County issued its Order finding that the estate was properly distributed and releasing the executor from any further liability. The Petition to Re-open Estate, to Remove Trustee, for Judgment and for Other Relief was filed by Petitioner on February 24, 1995, six months after the estate was closed, over four years after Ms. Frazer's death, and almost five years after the thefts were discovered.

Emily Robinson Frazer was a wealthy widow living in Belle Meade at the time of her death in 1990. Her father, James D. Robinson, Sr., had been Chairman of the Board of Directors of FNBA (now Wachovia), and was succeeded in that capacity by his son, James D. Robinson, Jr. James D. Robinson, III was President and CEO of American Express Company and is a Director of Coca Cola Company. The Robinsons are one of the most prominent families in Atlanta, Georgia, and their relationship to Wachovia dates back to the creation of FNBA after the War Between the States. Following some disagreement with her brother, James D. Robinson, Jr.,

1. No evidence has ever been presented showing that any additional money was stolen during the time after Ms. Frazer set up her trust at FNBA.

Mrs. Frazer kept her personal funds in a custodial account at C & S Bank in Atlanta. Members of the family persuaded her, in 1989, to return to the "family" bank, and she closed her account at C & S, executing a new Revocable Living Trust for Management and Disability purposes with FNBA as trustee. Contemporaneously, she executed a Limited Durable Power of Attorney in favor of FNBA which provided in part: "This Power of Attorney, as well as the Revocable Living Trust Agreement referred to herein, are established to eliminate any necessity for a Guardianship of my property, and these documents shall be so construed."

Construed in conjunction with each other, the Limited Durable Power of Attorney, together with the Revocable Living Trust for Management and Disability Purposes executed by Mrs. Frazer on March 23, 1989, gave to Mrs. Frazer complete and unfettered control of the assets of the trust so long as she remained mentally competent, subject only to the right of the trustee to receive instructions from her in writing. The governing instruments, thereafter, provide for the duties of the trustee in the event Mrs. Frazer became incompetent.

As all parties agree that Mrs. Frazer was never incompetent, but rather an astute, intelligent, strong minded and competent handler of her own affairs until the day she died, the following provisions of the Revocable Living Trust for Management and Disability Purposes are deemed applicable in this case:

### ITEM THREE

A. I hereby reserve the right at any time and from time to time to revoke, alter or amend this trust in whole or in part, in any particular, including but not limited to the power to change or add beneficiaries, by an instrument in writing delivered to my Trustee; provided, however, that no alteration or amendment shall reduce the compensation of my Trustee, or increase its duties or obligations, without its written consent. Any revocation, alteration or amendment shall take effect upon the delivery of the written instrument to my Trustee or, when required, upon my Trustee's subsequent written consent thereto. If the trust is revoked in its entirety, my Trustee shall deliver all the trust assets to me as soon thereafter as may be reasonably possible.

B. In the administration of this trust, my Trustee may make such sales or purchases of investments as it may deem advisable in its sole discretion; provided, however, that if I give my Trustee in writing any directions as to such sales or purchases of investments while I am capable of managing my own affairs, my Trustee shall follow my instructions. If, as aforesaid, my Trustee follows my written directions, it shall have no liability in respect thereto, as I desire to take full responsibility for any such changes in investments specified by me. My Trustee shall notify me in a timely fashion of all investments made, whether made in the Trustee's discretion or at my direction.

### ITEM FOUR

My Trustee shall hold, manage, invest, and reinvest the said property upon the following uses and trusts:

A. My Trustee shall utilize so much of the net income therefrom and, to the extent necessary, so much of the principal thereof as my Trustee, in its discretion, deems appropriate to provide for my comfortable support, maintenance and medical care in the manner to which I am accustomed, during my life. In the event that I should become unable to

manage my own affairs (whether or not legally adjudicated an incapacitated adult) and be certified to that effect by two attending physicians, my Trustee shall be authorized to continue to pay income for my benefit and, to the extent necessary, to encroach periodically upon the principal of this trust, to provide for my comfortable support, maintenance and care, including but not limited to medical and hospitalization expenses. At any time prior to my incapacity, I shall have the right to direct my Trustee to turn over to me any amount of net income and/or principal as I may from time to time in writing direct my Trustee.

B. My Trustee shall also be authorized to utilize so much of the net income from this trust which my Trustee does not deem necessary or appropriate to expend for my benefit (and which I have not directed my Trustee to turn over to me) to provide for the support, maintenance, medical care and education (including all forms of postgraduate education) of any one or more of my three grandsons, DIXON ROBINSON HEAD, EMERSON WINGATE HEAD and FRANCIS MURPHY HEAD. My Trustee, in exercising its discretion hereunder, is authorized to take into account the other resources and means of support as known to the Trustee of each of my said three grandsons, which resources and means of support shall include, but not be limited to, property acquired by inheritance. Any distributions in accordance with this paragraph are to be made in the sole discretion of my Trustee, who shall not be required to make any such distributions if my Trustee so determines; however, it is my desire (although not legally binding) that my Trustee be guided by my past history of benefiting (sic) my said three grandsons. At any time prior to my incapacity, I shall have the right to direct my Trustee to turn over to any one or more of my said three grandsons any amount of net income and/or principal as I may from time to time in writing direct my Trustee.

Petitioner, in his Petition and Amended Petition, twisted a tantalizing story of intrigue and deceit; however, the petitioner fails to set out any basis for a claim against Wachovia (formerly FNBA), David Addison, or Gilmore Crumpler (the trust officer that took over management of Ms. Frazer's trusts after Mr. Addison resigned). Petitioner based all allegations of liability in this matter on the assertion that Mr. Addison and FNBA breached their fiduciary duty to Ms. Frazer, and thus, all subsequent actions by FNBA and/or its employees are tainted by a conflict of interest resulting from the initial breach of duty. We find, as a matter of law, that no breach of fiduciary duty occurred and that the Petition was properly dismissed.

The Motion for Summary Judgment filed by Respondents Wachovia and Crumpler provided the following as its basis for summary judgment:

There are no genuine issues of material fact, and Wachovia and Crumpler are entitled to judgment as a matter of law on the following grounds:

1. Wachovia and Crumpler did not breach any duties owed to Mrs. Emily Robinson Frazer ("Mrs. Frazer").

2. Ms. Frazer's Estate and Francis Head have no damages.

3. Francis Head's claims are barred by the equitable doctrine of estoppel, waiver, release and latches.

David Addison filed a separate Motion in which he adopted the Motion, Memorandum and Statement of Undisputed Facts filed by Wachovia and Crumpler. The probate court granted Respondents' Mo-

tion for Summary Judgment stating that, "based upon a review of the entire record, pleadings, and briefs, and after hearing the arguments of counsel, the Court is of the opinion that Respondents' Motion is meritorious and should be, and is, GRANTED."

## II.   Standard of Review

The sole issue presented for review is whether the probate court properly granted summary judgment in favor of Respondents.   This determination is reviewed *de novo* without any presumption of correctness.

> The standards governing an appellate court's review of a trial court's action on a motion for summary judgment are well settled.   Since our inquiry involves purely a question of law, no presumption of correctness attaches to the trial court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R.Civ.P. 56 have been met.   Tenn. R.Civ.P. 56.03 provides that summary judgment is only appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts.   The moving party has the burden of proving that its motion satisfies these requirements.

*Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995) (citations omitted); *see also Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993). In addition, "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Byrd*, 847 S.W.2d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## III.   Breach of Fiduciary Duty

The primary allegation made by Petitioner against Respondents is that they breached their fiduciary duty as trustee of Ms. Frazer's trust and/or as executor of her estate.   Thus, the elements that must be proven by Petitioner are: (1) to whom did Respondents owe a duty; (2) what duty was owed, and (3) was that duty breached.   Although the facts precipitating the questions are made out to be quite convoluted, the material facts are undisputed and the answers are actually simple: FNBA and its employees owed a duty to Ms. Frazer and Ms. Frazer only; that duty was to comply with the trust document, which required the trustee to obey Ms. Frazer's direction and handle her account in the manner requested by her. This duty was not breached and, based on undisputed evidence, performed by all Defendants to the satisfaction of Ms. Frazer.

We first examine trust law to determine the trustee's duty in this matter and to whom this duty was owed.   Under Georgia law, as in most jurisdictions, "[a] trust may be created for any lawful purpose."   Ga. Code Ann. § 53–12–23 (1997).   "In trust law, the cardinal rule is that the trustor-settlor's intention be followed." *Griffith v. First Nat'l Bank & Trust Co.*, 249 Ga. 143, 287 S.E.2d 526, 529 (1982), *see also Perling v. Citizens & S. Nat'l Bank*, 250 Ga. 674, 300 S.E.2d 649, 651 (1983).   In discerning the intent of the settlor in an express trust, "we look first and foremost to the language therein and interpret that language to effectuate the intent of the settlors." *Ovrevik v. Ovrevik*, 242 Ga.App. 95, 527 S.E.2d 586, 588 (2000).   However, if the trust instrument is ambiguous, the court can turn to parol evidence to determine the settlor's intent. *Id.*

In examining the actual trust document, we note the following: First, the trust was called "Revocable Living Trust for Man-

agement and Disability Purposes." Second, under Item Three, A., the trust was wholly revocable by Ms. Frazer. Third, under Item Three, B., Ms. Frazer reserved the right to direct all sales or purchases of investments while she was able to manage her affairs and took full responsibility for all actions performed under her direction. Fourth, under Item Four, A., the trustee is directed to provide for her comfortable support in the manner to which she had become accustomed; however, she specifically reserved the right to direct the Trustee to turn over to her any amount of net income and/or principal she requested. Finally, when reviewing the entire document, it is evident that the trust is generally set up to reserve all power to manage her affairs to Ms. Frazer but to provide a ready vehicle conveying immediate authority to her trustee to manage her affairs should she become incapable of doing so herself.

Although Ms. Frazer never articulated to anyone exactly why she chose to place her assets in a trust, the testimony of trust professionals revealed the primary reasons for setting up a revocable trust are to avoid probate and to prepare in advance for management of the settler's affairs should she become incompetent at a later date. Testimony of family members also revealed that her prior custodial account caused her great dissatisfaction due to the necessity of hiring and paying for a separate investment manager. Under the revocable trust agreement, investment management services were provided in-house by the bank trustee.

A basic summary of the responsibilities of the trustee outlined in the trust document are: (1) to make investment decisions, unless the grantor makes specific investment directions, (2) to manage her trust assets should she become incompetent to do so, (3) to use discretion in providing for her grandchildren should they ask the trustee for financial support, (4) to make any and all distributions requested by her, (5) to accumulate any income not distributed, and (6) to distribute her trust upon her death. The trustee performed all these duties without complaint from Ms. Frazer. All distributions made from the trust and services provided by FNBA were performed at her request, to her satisfaction.

Petitioner's first argument is that Mr. Addison, Ms. Frazer's trust officer at FNBA (the trustee bank), was involved in a relationship that might have compromised his judgment and from which he might have obtained some benefit, directly or indirectly traceable to the illegal activities of Ms. Pennington. Petitioner goes on to argue that, somehow, this possible compromise of judgment might have prevented him from making some inquiry into Ms. Frazer's personal affairs unrelated to her trust, which might have then resulted in the discovery of illegal activity occurring in another state at an unrelated financial institution. The theory continues, alleging that these potential failures amounted to a breach of some duty required of the trustee. However, all Petitioner presents are allegations without evidence. Based on the actual undisputed evidence and testimony, no breach of duty can be found.

The trust was set up primarily for the purpose of estate and disability planning. All authority was retained by the settlor, Ms. Frazer, unless she became incompetent, and her competence is not an issue in this case. The trust was not a spend thrift trust and put no limitations on the amount of money that could be withdrawn by the settlor/beneficiary nor any restriction on the reason the money could be withdrawn. The trustee had no obligation or authority to oversee any of Ms. Frazer's personal finances.

In addition, Ms. Frazer evidenced her desire to not be questioned regarding her personal affairs and spending habits. It was well known, and testified to by all who knew her, that Ms. Frazer spent a lot of money. She purchased furs and jewelry; she spent great amounts of money on her home renovation, and she spent large sums on the support and maintenance of her three grandsons. Further, she was extremely private about her money and how it was spent and did not wish to be questioned in that regard. Both grandsons that were deposed testified to their reluctance to attempt any discussion with Ms. Frazer about her finances, as she had reacted with anger to their past attempts. Mr. Addison testified that he twice requested Ms. Frazer's financial and expense information, but she showed no interest in cooperating and never provided the information. Mr. Addison further testified that he consulted her brother, English Robinson, regarding his difficulty in obtaining information from her. Mr. Addison was told by Mr. Robinson 'not to do anything else' and 'just do what she wants.' It is obvious from the purpose of the trust and clear desires and actions of the settlor/beneficiary that Mr. Addison had no duty to oversee, or make any inquiry regarding, her personal spending habits. As such, any failure to do so constituted no breach.

With regard to actions taken following discovery of the embezzlement, she approved the settlement and directed that no legal action be taken. In addition, Ms. Frazer ratified any action taken by her trustee, in that she knew about the embezzlement and affair and chose not to take issue with any of the trustee's actions regarding the management of her trust. *See Lugue v. Hercules, Inc.*, 12 F.Supp.2d 1351, 1357 n. 6 (S.D.Ga.1997); *In re Spengler*, 228 Wis.2d 250, 596 N.W.2d 818 (Ct. App.1999). She even chose to retain FNBA as her trustee and appoint them executor of her estate after gaining full knowledge of the affair between Mr. Addison and Ms. Pennington and the embezzlement by Ms. Pennington.

The second allegation of breach made by Petitioner is a general claim of conflict of interest resulting from the trustee's alleged breach of duty and an appearance of impropriety. However, any possible conflict of interest or appearance of impropriety was known to Ms. Frazer, and with that knowledge, she elected to continue the trust as originally established, to keep FNBA as trustee, to designate FNBA as trustee of all trusts created under her will (which was executed after she possessed knowledge of the embezzlement and affair), and to not prosecute or pursue any legal action against FNBA, Mr. Addison, or Mr. Crumpler.

Evidence in the record demonstrates that Ms. Frazer was warned by her grandsons in the early 1980's that the Penningtons might be behaving fraudulently. Her bank in Nashville even questioned her about the large amount and number of checks written on her account. However, when confronted with the possibility of being taken advantage of, she informed all questioners that her spending was her business and her decision. Later, she determined to whom her checking account and personal affairs were entrusted, and she made the decision to request money from her trust knowing that she was invading the corpus of the trust. Any confrontation regarding her spending was met with anger and defensiveness, and she never blamed the bank or trust officer for not discovering the theft. Testimony revealed that she was extremely pleased with the bank's handling of the matter. Regardless of what Petitioner wishes had happened or his desire to impress his will on that of his grandmother, her will in the matter of her trust and the handling of the thefts is

evident and was followed to the letter by her trustee.

Nothing speaks more forcefully of the desire of Emily Robinson Frazer to get the whole embarrassing Pennington episode behind her than the mutual covenant not to sue executed under notary seal by both Frazer and Pennington on April 3, 1990. It provides:

WHEREAS, it is the desire of Frazer and Pennington to resolve all of their disputes and differences and to set forth their mutual understandings and agreements with respect thereto;

NOW, THEREFORE, for and in consideration of premises and the mutual promises, covenants, and agreements contained herein, the payment by Pennington of FIVE HUNDRED TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($525,000.00) to Frazer, and the exchange of other good and valuable consideration, the receipt and sufficiency of said consideration being hereby acknowledged, Frazer and Pennington hereby agree as follows:

1.

Frazer covenants and agrees not to sue or maintain any claim, demand, action or cause of action against Pennington, and her heirs, executors, administrators, successors; assigns, employees, agents and attorneys, on any and all claims, demands, actions and causes of action of any kind or nature whatsoever, known or unknown, developed or undeveloped, foreseen or unforeseen, matured or unmatured, concealed or unconcealed, which Frazer has, might have or might claim to have against Pennington at this time.

2.

Pennington covenants not to sue or maintain any claim, demand, action or cause of action against Frazer, and her heirs, executors, administrators, successors, assigns, employees, against and attorneys, on any and all claims, demands, actions and causes of action of any kind or nature whatsoever, know or unknown, developed or undeveloped, foreseen or unforeseen, matured or unmatured, concealed or unconcealed, which Pennington has, might have or might claim to have against Frazer at this time.

3.

Each party expressly acknowledges the possibility that subsequent to the execution of this Mutual Covenant Not To Sue, any party may discover, incur or suffer claims which were unknown or unanticipated at the time this Mutual Covenant Not To Sue is executed, which if known by said party on the date this Mutual Covenant Not To Sue is being executed may have affected her decision to execute this Mutual Covenant Not To Sue. Each party expressly acknowledges and agrees that she is assuming the risk of the existence of, and covenanting not to sue the other party on such unknown and unanticipated claims, and this Mutual Covenant Not To Sue is intended to and shall be construed to bar all claims of whatever kind, nature or description which either party has ever had against the other party up to and including the date of the execution of this Mutual Covenant Not To Sue.

4.

Anything to the contrary herein notwithstanding, this Mutual Covenant Not To Sue is not intended to and shall not be construed as a release, waiver or limitation of any claims, demands, actions or causes of action of any kind or nature whatsoever which Frazer ever had, now has, shall or may have in the

future against Dwight L. Pennington or Pennington Builders, Inc., or both.

### 5.

Pennington agrees to return to Frazer's designated representative within five days after the date of execution of this Mutual Covenant Not To Sue the following items (which were in Frazer's home):

(a) Two dining room chairs;

(b) One chest;

(c) One mattress; and

(d) One gold colored sink.

### 6.

Each party agrees to return to the other, via Frazer's designated representative, the two silver candlesticks they previously exchanged.

### 7.

The parties agree to have no further contact of any nature whatever with one another.

### 8.

It is understood and agreed that the aforementioned consideration, as well as the promises, covenants and agreements provided for herein, are given and received for the purpose of compromising disputed claims, and this Mutual Covenant Not To Sue is not and shall not be construed to constitute an admission of liability or wrongdoing on the part of the parties.

### 9.

This Mutual Covenant Not To Sue shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, executors, administrators, representatives, successors and assigns.

### 10.

The parties hereto each warrant and represent that they have not conveyed, pledged, transferred, hypothecated or in any manner encumbered or assigned, to any person or entity any of the claims, demands, actions or causes or action referred to herein.

### 11.

This Mutual Covenant Not To Sue constitutes the sole and entire agreement between the parties hereto, and no modification, alteration or amendment of this Mutual Covenant Not To Sue shall be binding unless expressed in a writing signed by both parties. No representation, warranty, covenant, inducement or obligation not included in this Mutual Covenant Not To Sue shall be binding upon either party hereto.

### 12.

This Mutual Covenant Not To Sue shall be governed by and construed in accordance with the laws of the State of Georgia.

IN WITNESS WHEREOF, the parties have set their hands and affixed their seals as of this _3rd_ day of April, 1990.

If this is not enough to evidence what Mrs. Frazer knew and what she wanted to do in a matter in which she, and she alone, had the power and the right to act, the testimony of Francis Murphy Head himself is conclusive:

Q. So if Mr. Kirby or Mr. Morrison testify that they specifically told Mrs. Frazer that probably more money had been taken and that she understood that, you would have no basis to refute that. Is that correct?

A. I think that's fair to say.

Q. And if they also testify that Mrs. Frazer specifically told them that she did not want them to go back and try to compute any thefts prior to the time that they were the trustee, would you have any basis to refute that?

MR. SCHWALB: (then attorney for Francis Head) Prior to the time Wachovia was the trustee?

MR. DAGLEY: Yes.

BY MR. DAGLEY:

Q. Prior to the time that Wachovia was the trustee.

A. No. I couldn't refute that. She wasn't really interested in pursuing it from the get-go.

Q. Were you aware that Mrs. Frazer was very pleased with the settlement and the amount that was recovered by Jones Day from Mrs. Pennington?

A. I—I believe she was very happy that everything was over.

Q. Did she ever tell you that she was displeased in any way with anything that Jones Day or Wachovia had done in connection with recovering the money from Mrs. Pennington?

A. No.

Q. Did she ever tell you that she thought Jones Day had done anything wrong?

A. No.

Q. Did she ever tell you that she thought Wachovia had done anything wrong?

A. No.

Q. Did she ever tell you that she was dissatisfied because she thought Anne may have stolen more money?

A. No.

Q. During the time of these negotiations, was your grandmother competent to understand what was taking place?

A. I'm not a judge of whether she was competent or not.

Q. Do you have any reason to believe that she was not competent?

A. I've—I have a lot of reasons to believe she wasn't a good judge of money in general and that fiscal matters were perhaps complex and difficult for her to understand.

Q. Was she in control of her faculties at that time?

A. I believe so.

Q. And you believe she understood what people were telling her about the negotiations?

A. I believe she could accurately say what was going on in regards to what Anne had done and what Jones Day and Wachovia was trying to do. That they were trying to recover money on her behalf.

Q. It's not your position then in this lawsuit that your grandmother was not mentally competent at the time of the negotiations. That's really what I'm trying to find out. Is that going—

A. I understand what you're trying to ask, and I'm not a judge of whether or not she was competent or not. I don't have any reason to believe that she was senile. But other than that, whether or not she understood, you know, I know she was pretty happy that everything was so-called taken care of and that she was really disappointed and hit pretty had by, you know, what Anne had done.

Q. Okay. I understand that, but is it going to be your position when we go to the trial in this case—

MR. SCHWALB: No.

MR. DAGLEY: Okay. Competency's not going to be an issue.

MR. SCHWALB: Competency's not going to be an issue.

## IV.  Conclusion

There is no issue regarding Ms. Frazer's competence.  All parties admit that she was competent and that she was fully in charge of all her affairs.  The bank was not serving in any status as her guardian, and her trust was a wholly revocable trust containing her money, fully accessible to her to be spent in any way she chose, for anything she chose.  Unless she requested the services of the bank in overseeing her spending, the bank was not required to, and based on her actions, even prohibited from questioning her personal spending habits.  She made all decisions regarding how to handle the embezzlement matter based on her interests and desires (those being to dispose of the matter quickly and without any publicity or embarrassment), and Respondents obeyed her instructions, as they were required to do.  Decisions about how far back the embezzlements should be traced, whether or not to pursue legal action, approval of the settlement, continuation of FNBA as trustee and executor of her estate, and the final draft of her will were made with full knowledge of Mr. Addision and Ms. Pennington's actions, as well as, any possible conflict of interest on the part of the bank.

As long as Emily Robinson Frazer was competent, neither her grandsons, as potential beneficiaries of the revocable trust, nor anyone else had standing to question her judgment.  As one court has observed:

> So long as a trust is revocable, a beneficiary's rights are merely potential, rather than vested.  The beneficiary's interest could evaporate in a moment at the whim of the trustor. . . . Giving a beneficiary with a contingent, nonvested interest all the rights of a vested beneficiary is untenable.  We cannot confer on the contingent beneficiary rights that are illusory, which the beneficiary only *hopes* to have upon the death of the trustor, but only if the trust has not been previously revoked and the beneficiary has outlived the trustor.

*Johnson v. Kotyck*, 76 Cal.App.4th 83, 90 Cal.Rptr.2d 99, 103 (1999) (emphasis in original).

Mrs. Frazer, mentally competent and fully informed as to the Pennington–Addison affair, the Pennington embezzlement, and the bank's potential conflict of interest, chose not to pursue the matter but rather to put it all behind her and go on with her life.  It is not the prerogative of her grandsons, the Probate Court of Davidson County, or the Court of Appeals of Tennessee to second guess her judgment.

The judgment of the trial court is in all respects affirmed, and costs are assessed to Petitioner, Francis Murphy Head.